UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

UNITED STATES OF AMERICA,

      Plaintiff,

      v.                                            Case No. 25-CR-64

JOSE ANGEL HERNANDEZ-PINEDA,

      Defendant.

---

## ORDER GRANTING MOTION TO SUPPRESS EVIDENCE

---

Defendant Jose Angel Hernandez-Pineda is charged in an indictment with (1) possession of 500 grams or more of cocaine with intent to distribute, (2) possession of a firearm in furtherance of a drug trafficking offense, and (3) possession of a firearm as an illegal alien. The charges arise out of a March 7, 2024, search of an apartment. The case is before the court on Hernandez-Pineda's motion to suppress the evidence on the ground that the search was in violation of his rights under the Fourth Amendment. Hernandez-Pineda argues that law enforcement officers searched his apartment without a warrant and without his voluntary consent. Although he signed a consent to search form, he argues that whatever consent he gave was involuntary and thus invalid. Hernandez-Pineda further argues that the search conducted exceeded the scope of the consent he purportedly gave. In response, the government argues as a threshold matter that Hernandez-Pineda failed to establish that he had a legitimate expectation of privacy in the apartment and thus lacks standing to challenge the search. The government also argues that Hernandez-Pineda voluntarily consented to the search and that the search did not exceed the scope of the consent he gave.

An evidentiary hearing was held on the motion on June 10, 2025, and the parties have fully briefed the issues raised in the motion. The following constitutes the court's factual findings based upon the evidence presented at the hearing, including the recordings taken from the cameras worn by the officers (bodycams) during the course of the encounter, aided by the transcripts that were prepared by the defense to assist in accessing the key portions of the recordings. From those findings of fact, the court concludes that Hernandez-Pineda had a reasonable expectation of privacy in the apartment that was searched, that his consent was not voluntary, and that the search conducted exceeded the scope of the consent he is alleged to have given. It follows that the motion to suppress must be granted.

**FACTS**

On March 7, 2024, a task force consisting of local law enforcement and Drug Enforcement Agency (DEA) officers were investigating drug trafficking in the Green Bay area. DEA Special Agent Patrick Beckman was alerted by DEA-Chicago earlier that day that the occupants of a red Audi leaving Chicago had engaged in bulk-cash smuggling and were returning to Green Bay. Because DEA-Chicago's investigation was ongoing, S.A. Beckman was instructed that he was not to disclose the drug-related origin of the tip.

Agents located the Audi traveling on the highway northbound and followed it to Willow Park Apartments on University Avenue in Green Bay, Wisconsin, where one of the occupants exited the Audi and entered the apartment building. The agents were able to identify the occupant who exited the Audi and entered the apartment building as Jorge Perez Cruz, a person who they had determined to be the likely source of the cocaine a confidential informant working with them had purchased approximately four-and-a-half months earlier.

After dropping Perez Cruz off, the Audi proceeded to an apartment building at 2080 Verlin Road where the driver parked the Audi in a detached garage and entered the common door for the apartments numbered nine to sixteen. By that time, the agents had learned from a report of a January 17, 2024, traffic stop of the same Audi that the driver was Hernandez-Pineda and that he had given his address at that time as 2080 Verlin Road, Apartment 14, Bellevue, Wisconsin. The officers continued surveillance after Hernandez-Pineda entered the building until he emerged about an hour later. They then followed him as he got back into the Audi and made several stops, including one in a parking lot at JBS Foods, a meat processing facility, where he was observed conducting what appeared to be a hand-to-hand drug deal. Hernandez-Pineda thereafter returned to the Verlin Road apartment complex and pulled into an outdoor parking space near the common entry door. The agents pulled in directly behind him and immediately approached him as he exited his car.

In order to protect the broader drug investigation, the agents had decided to use a ruse to get him to consent to their search of both the Audi and his apartment. The ruse consisted of telling Hernandez-Pineda that they needed to quickly search his car and apartment for a three-year-old child who had been missing in the Northeast Wisconsin area for the past three weeks. The officers falsely told Hernandez-Pineda that they had received a tip that a car matching the description of the car he was driving was potentially involved in the abduction of a three-year-old child who, as reported by local media, had been missing for over three weeks. (In fact, a child from Two Rivers, a nearby city, had been reported missing several weeks earlier. Sometime later, the child's body was found, and his mother's boyfriend was charged with his murder.) S.A. Beckman explained that they were tasked with running down such tips and that they "needed" to search Hernandez-Pineda's Audi and his apartment just to verify that the child was not there. As the agent explained,

3

"he [the child] was kidnapped or killed three weeks ago and so like we're having everybody on the planet if anybody calls in anything they're like you gotta follow up on it." Ex. 1003 at 3. S.A. Beckman explained: "We just need to check this [the Audi] quick and check your apartment real quick and then we'll get out of here. Okay?" *Id.*

Hernandez-Pineda, whose native language is Spanish, eventually allowed the search of the Audi but denied that he lived at the apartment complex. The agents clearly did not believe him and persisted in seeking consent to search his apartment. When Hernandez-Pineda insisted he did not understand English, one of the agents telephoned Irvin Benitez, a DEA Spanish-speaking task force officer with whom he previously had worked, explained the ruse to him, and had Officer Benitez translate what they were saying into Spanish over the phone. Officer Benitez explained to Hernandez-Pineda that the officers had received information about the child that had been abducted and that his car matched the description of the vehicle seen in the area, "so they're checking the vehicle and they have to check where you live." Ex. 1001 at 4. Hernandez-Pineda asked if they had an order to check, stating he did not understand because he didn't live there but was just picking up his nephew. *Id.* Officer Benitez told Hernadez-Pineda that the other agents wanted to search his apartment for evidence on the missing child investigation "to check/look at everything to make sure everything checks out." Ex. 1001 at 5. Elaborating further, he explained: "They have their job to do. If they searched the car, the next step is they have to check the house . . . ." *Id.*

Eventually, Hernandez-Pineda was handed the keys taken from his car and led the officers into the apartment building. He proceeded to unlock the apartment, and the officers immediately entered and began looking in dresser drawers and closets. In the bathroom closet, they found a duffle bag that contained two kilogram-sized bricks of Cocaine. They also found a 9 mm pistol in

the same bathroom closet. A Mexican ID and a passport were found in the master bedroom, though the record does not reflect the name on either. Dkt. No. 19 at 62. While still in the apartment, the agents had Hernandez-Pineda sign a consent to search form authorizing the search that had just been completed.

Officers later obtained the lease for the apartment from the landlord. Ex. 8. The sole tenant listed on the lease is Jorge Perez Cruz, the same individual that Hernandez-Pineda had dropped off at the Willow Park Apartments on University Avenue. Under Cruz's name is the notation "No Others Allowed." *Id.* Another provision of the lease states that the tenant may not permit any guest or invitee to reside in the premises for any period exceeding three days without prior written consent of the landlord.

## ANALYSIS

### A. Expectation of Privacy

The government argues that the defendant's motion to suppress should be denied because Hernandez-Pineda did not establish he had a reasonable expectation of privacy in the apartment and thus cannot show that law enforcement violated his Fourth Amendment right. This argument is based on the principle that Fourth Amendment rights are personal. They may not be asserted vicariously on behalf of another. Though often referred to as standing, this is a substantive element of a Fourth Amendment claim. *United States v. Dixon*, 137 F.4th 592, 601 (7th Cir. 2025). In other words, "a defendant charged with a crime of possession can only claim the benefits of the exclusionary rule if his or her own Fourth Amendment rights have been violated." *United States v. Mendoza*, 438 F.3d 792, 795 (7th Cir. 2006). "Additionally, a defendant must show a privacy interest not only in the seized good, but also in the area where the good was found." *Id.*

A reasonable expectation of privacy has both a subjective and an objective component. "A legitimate expectation of privacy exists when the defendant exhibits a subjective expectation of privacy and the expectation is one that society is prepared to recognize as reasonable." *United States v. Pitts*, 322 F.3d 449, 456 (7th Cir. 2003). Although it appears from the record that Hernandez-Pineda is not in the country legally and may be under an order of removal, Dkt. No. 6 at 2, the government does not argue that he is outside the protection of the Fourth Amendment. *See, e.g.*, *United States v. Esparza-Mendoza*, 265 F. Supp. 2d 1254, 1271 (D. Utah 2003) (holding that "an individual previously deported alien felon is not free to argue that, in his particular case, he possesses a sufficient connection to this country to receive Fourth Amendment coverage (unless, of course, he could prove he was in this country lawfully)"). Instead, the government argues that Hernandez-Pineda failed to establish that he had a subjective expectation of privacy in the apartment where the evidence was found.

Because Hernandez-Pineda bears the burden of establishing his standing to challenge the search, he needed to come forward with some evidence that he had a subjective expectation of privacy in the apartment where the evidence was found. *Dixon*, 137 F.4th at 601 ("An accused defendant seeking to suppress evidence obtained from an allegedly unconstitutional search bears the burden of establishing that the search violated his own Fourth Amendment rights."). The Seventh Circuit has repeatedly noted that "it is almost impossible to find a privacy interest without an affidavit or testimony from the defendant." *Id.* at 602 (citing *Mendoza*, 438 F.3d at 795; *United States v. Ruth*, 65 F.3d 599 (7th Cir. 1995)). This is "because this interest depends, in part, on the defendant's subjective intent and his actions that manifest that intent." *Ruth*, 65 F.3d at 605. But "almost impossible" does not mean always impossible. *Dixon* also stated that a defendant seeking to suppress evidence he claims was obtained in violation of his Fourth Amendment rights must

"present evidence of his standing or *at least point to specific evidence in the record which the Government presented and which established his standing.*" *Id.* at 603 (quoting *United States v. Zermeno*, 66 F.3d 1058, 1062 (9th Cir. 1995)) (italics added).

Caselaw instructs courts to consider the following factors in deciding whether a defendant has a legitimate expectation of privacy sufficient to support standing to assert a Fourth Amendment right against government intrusion:

> (1) whether the defendant had a possessory [or ownership] interest in the thing seized or the place searched, (2) whether he had the right to exclude others from that place, (3) whether he exhibited a subjective expectation that it would remain free from governmental invasion, (4) whether he took normal precautions to maintain his privacy, and (5) whether he was legitimately on the premises.

*United States v. Carlisle*, 614 F.3d 750, 759 (7th Cir. 2010) (alteration in original). Consideration of the evidence presented bearing on these factors supports a finding Hernandez-Pineda had an expectation of privacy in the apartment.

Although Hernandez-Pineda did not present an affidavit or testimony establishing his subjective expectation of privacy in the apartment, he does point to evidence the government introduced that he contends establishes his standing. This includes evidence that he gave police the Verlin Road address as his address during a traffic stop a few months before the search and that law enforcement relied upon that information at the time of the search. Ex. 1 at 4. He also notes that law enforcement entered that address on the consent form they had Hernandez-Pineda sign. The very fact that they repeatedly asked him for consent to search the apartment and referred to it as his apartment, Hernandez-Pineda contends, shows that it was his apartment and that he had an expectation of privacy in it, as does the fact that he expressed reluctance to provide the consent they sought. Hernandez-Pineda notes that he had the key to the apartment and that once he had given in to the officers' insistence that they be allowed to search his apartment for the missing

7

child, he led them directly to Apartment 14 and promptly opened the door using the correct key from those on the key ring taken from his car. Hernandez-Pineda also points to the bodycam footage showing that once they entered the apartment, he changed from the sweatshirt he was wearing to a brown jacket that was in the apartment and that his Mexican ID and passport were found in the bedroom as further evidence that it was his apartment. The fact that his clothes were there and that he kept such important identification documents in the locked apartment to which he held the key, Hernandez-Pineda argues, demonstrates his expectation of privacy.

This evidence, along with the fact that he had initially parked his car in the detached garage for the apartment building, shows that Hernandez-Pineda not only had a possessory interest in the apartment but that the law enforcement officers understood he had such an interest. The officers knew that Hernandez-Pinada gave the Verlin Road address as his residence in a traffic stop that occurred a few months before the search. The testimony reveals that the law enforcement officers who conducted the search relied upon that information as being his correct address, notwithstanding Hernandez-Pineda's efforts to distance himself from the apartment by denying he lived there. The fact that the apartment was locked, that he possessed the keys to the apartment, and that he opened it for the officers to enter so that they could conduct the search is further evidence of his expectation of privacy in the contents of the apartment. After all, one does not lock a door to one's apartment if one intends strangers to freely enter. Locking the door to one's apartment is a normal precaution one would take to protect one's privacy. The bodycam footage also shows Hernandez-Pineda's possessions within the apartment and that he changed clothes while there. The officers repeatedly indicated their need to search "your apartment." The fact that they repeatedly asked for his consent to search the apartment shows that they knew he lived there

and had an expectation of privacy that required his consent to override. His expectation of privacy in the apartment is also clear from his reluctance to provide such consent.

This evidence and the other evidence in the record is sufficient to establish that Hernandez-Pineda did in fact have an expectation of privacy in the apartment. It was the apartment in which he was staying and storing his possessions. The fact that it was an apartment, as opposed to a car or a bag, is also significant. The government cites several cases for the proposition that statements of disassociation from property can support a court's finding that a defendant lacks standing to challenge the search. *See Carlisle*, 614 F.3d at 759 (affirming denial of a motion to suppress based in part on defendant's statement to officers that he did not own bag that was searched); *see also United States v. Amaral-Estrada*, 509 F.3d 820–27 (7th Cir. 2007) (similar where defendant denied knowledge of car or bag inside). Unlike a bag found on the street, however, or a car parked in a lot, a person's home or dwelling place enjoys the greatest protection under the Fourth Amendment: "it is axiomatic that the physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed." *Welsh v. Wisconsin*, 466 U.S. 740, 748 (1984) (quotation omitted); *see also United States v. Thomas*, 65 F.4th 922, 926 (7th Cir. 2023) (noting "this case concerns a home, which is 'first among equals' in the eyes of the Fourth Amendment" (quoting *Florida v. Jardines*, 569 U.S. 1, 6 (2013)).

The government also emphasizes the fact that Hernandez-Pineda was not listed as a tenant on the lease. But this is after-acquired evidence. In *Thomas*, the court rejected the government's argument that "a search may be deemed valid or invalid depending on facts discovered later, in the course of prosecution." 65 F.4th at 925 ("The validity of a search depends on what law enforcement knew when they conducted the search. . . . What the agents knew at the time of the search was not enough to defeat Thomas's expectation of privacy in the condo.").

The same is true here. At the time of the search, the officers knew Hernandez-Pineda was at least staying at Apartment 14 at the Verlin Street address. It was not necessary that Hernandez-Pineda be a signatory on the lease or rental agreement since even an overnight guest can have a Fourth Amendment right when he resides at a home "with the permission of his host, who is willing to share his house and his privacy with his guest." *Minnesota v. Olson*, 495 U.S. 91, 99 (1990). The fact that Perez Cruz, the person whom Hernandez-Pineda had dropped off at the Willow Park Apartments immediately prior to his initial arrival at the Verlin Road apartment complex, was listed as the tenant of the Verlin Road apartment supports the inference that Hernandez-Pineda was at least a guest. And the fact that Hernandez-Pineda's stay there may have violated the terms of the lease does not eliminate his legitimate expectation of privacy. *Thomas*, 65 F.4th at 923–24. Based on these considerations, the court concludes that Hernandez-Pineda has standing and had a reasonable expectation of privacy in the apartment that was searched.

**B. Voluntariness of Consent**

A warrantless search of a premises can be lawfully conducted with the consent of the person in lawful possession. *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973). To be valid, however, such consent must be freely and voluntarily given. *Id.* at 222. The question of whether consent was voluntary, as opposed to the product of duress or coercion, is a question of fact to be determined by the totality of the circumstances. *Id.* at 227. The government bears the burden of proving voluntariness by a preponderance of the evidence. *Id.* at 222.

In assessing the voluntariness of a person's consent, several principles have been highlighted:

> A consent obtained through the use of coercion, whether actual or implicit, is inherently involuntary. The form of coercion, whether it be physical or psychological, is of no consequence. Subtle coercion, in the form of an assertion of authority or color of office by the law enforcement officers may make what appears

> to be a voluntary act an involuntary one. Trickery, fraud, or misrepresentation on the part of the police to gain entry naturally undermines the voluntariness of any consent.

*United States v. Griffin*, 530 F.2d 739, 742–43 (7th Cir. 1976); *see also Hadley v. Williams*, 368 F.3d 747, 749 (7th Cir. 2004) ("The consent of Hadley's mother was procured by an outright and material lie and was therefore ineffectual.").

Consents elicited by law enforcement officers presenting themselves as law enforcement officers, but nevertheless lying about their authority or the purpose and scope of their investigation, are particularly troublesome: "Because citizens will respond to law enforcement with a sense of obligation and presumption of trustworthiness, multiple courts have held facially consensual searches to be invalid where the 'consent' was elicited through officers' lies about the nature or scope of their investigations." *Pagán-González v. Moreno*, 919 F.3d 582, 592 (1st Cir. 2019). Upon surveying cases in which such conduct was found to render the consent given involuntary, the First Circuit noted in *Pagán-González* that a consensus had emerged in the precedents that recognized two types of deception that "have an impermissibly coercive effect." *Id.* at 594. The first is where the consent to search is obtained by officers who falsely claim they have a warrant or otherwise claim authority they lack. *Id.* (citing *Bumper v. North Carolina*, 391 U.S. 543, 550 (1968) ("When a law enforcement officer claims authority to search a home under a warrant, he announces in effect that the occupant has no right to resist the search. The situation is instinct with coercion—albeit colorably lawful coercion. Where there is coercion there cannot be consent.").

The second type is where officers falsely present a need for urgent action. *Id.* at 595 ("[W]hen an officer lies about the existence of exigent circumstances, he also suggests that the occupant has no right to resist and may face immediate danger if he tries." (citing *United States v. Spivey*, 861 F.3d 1207, 1213 (11th Cir. 2017))); *see also United States v. Giraldo*, 743 F. Supp.

11

152 (E.D.N.Y. 1990) (holding consent involuntary where defendant led to believe there was life-threatening emergency by agents disguised as gas company workers who asked permission to enter to check for gas leak). In other words, false statements that leave an occupant with little choice but to consent or risk loss of life or serious injury are generally held to render consent obtained thereby invalid.

Courts also consider the following more individualized and specific factors in deciding whether consent is voluntary:

> (1) the age, education, and intelligence of the defendant; (2) whether he was advised of his constitutional rights; (3) how long he was detained before consenting; (4) whether he consented immediately or was prompted by repeated requests; (5) whether physical coercion was used; and (6) whether he was in custody when he consented.

*United States v. Jones*, 22 F.4th 667, 676 (7th Cir. 2022) (internal quotations and citations omitted). Courts also consider an individual's experience with the criminal justice system. *Id.* However, no single factor controls.

From the evidence presented, the court is unable to find that the government has met its burden of proving that Hernandez-Pineda freely and voluntarily consented to the search of his car or the apartment. Although he appears to be an adult male of average intelligence, Hernandez-Pineda is not a citizen, and English is not his native language. Even though a Spanish translator was made available by phone, Hernandez-Pineda repeatedly expressed difficulty in understanding what the officers were saying. He was not advised of his constitutional rights and was detained for close to ten minutes before he finally agreed to allow officers into his apartment after numerous requests. No physical coercion was used, and though it appears he was detained, he was not placed in custody or handcuffed prior to the search of the apartment.

More importantly, the court finds that the ruse used by the officers, together with their insistence that they had to search his apartment to verify that a missing child was not there, rendered any consent on his part involuntary. By repeatedly telling him that they had to check out his apartment and that it was their job to do so, as opposed to simply asking for his consent to do so, the officers were in essence telling Hernandez-Pineda that the search of his apartment was not up to him or even them. The suggestion was that they were compelled to conduct the search by their superiors. Although the officers did not go so far as to claim they had a warrant, their insistence that they could not leave until they satisfied themselves that the missing child was not in Hernandez-Pineda's apartment gave him no choice but to acquiesce in the search, as he ultimately did.

In addition to conveying that the search of his apartment was required, the ruse concocted by the officers also conveyed a sense of an emergency—they needed to find a missing child. One can readily understand why law enforcement would be justified in avoiding the delay involved in waiting for a warrant to be issued when a child's life or wellbeing is at stake. Although the government points out that the officers made some statements suggesting they were not acting in an emergency, the purpose for which the search was sought (to locate a missing child) and their insistence that they had to conduct it belies any claim that the circumstances were not exigent, indeed, potentially life-threatening, for the missing child.

Essentially, the same ruse was used by a DEA task force member in *United States v. Montes-Reyes*, 547 F. Supp. 2d 281 (S.D.N.Y. 2008). In that case, a DEA agent, seeking entry to a hotel room where he believed there were drugs, posed as a New York City police officer and knocked on the defendant's hotel room door. The agent told the defendant that he was looking for a missing four-year-old girl, showed him a flyer concerning the missing child, and asked for

permission to enter to search for the missing child. The defendant consented, which led to the officer's discovery of heroin in the room. In granting the defendant's motion to suppress the evidence obtained from the search, the district court held that "the consent Montes-Reyes gave to Agent Luna cannot be considered voluntary, as the 'missing girl' ruse used by Agent Luna created a false sense of exigent circumstances similar to that raised in a 'gas leak' scenario." *Id.* at 291.

The same conclusion follows here. Hernandez-Pineda did not voluntarily consent to the search of his apartment; he essentially acquiesced in the officers' insistence that they be allowed to search both his vehicle and his apartment for a missing child despite his repeated claims that he had nothing to do with the missing child and nothing would be gained by allowing them to search his apartment. The fact that he signed the written consent to search after the search had already started and the cocaine was found does not change the result. For this reason alone, his motion to suppress must be granted.

## C. Scope of Consent

Even if Hernandez-Pineda's consent had been voluntarily obtained, his motion to suppress would nevertheless be granted because the search conducted by the officers exceeded the scope of the consent they sought. The scope of the search conducted by law enforcement officers cannot exceed the scope of a defendant's consent. *United States v. Rahman*, 805 F.3d 822, 832 (7th Cir. 2015) (citing *United States v. Long*, 425 F.3d 482, 486 (7th Cir. 2005)). "The scope of a search is generally defined by its expressed object." *Florida v. Jimeno*, 500 U.S. 248, 251 (1991). In determining the scope of a defendant's consent, the court applies an objectively reasonable standard—what would the typical reasonable person have understood by the exchange between the officer and the suspect? *Id.* "Whether a search remained within the boundaries of consent is

a factual question that is determined by the totality of the circumstances." *Rahman*, 805 F.3d at 832; *United States v. Wesela*, 223 F.3d 656, 661 (7th Cir. 2000).

In *Rahman*, the court concluded that the defendant's signed consent to search his business for the origin and cause of the fire did not encompass a search for secondary and circumstantial evidence of arson and reversed the defendant's conviction for making false statements. 805 F.3d at 827, 832. And in *United States v. Dichiarinte*, 445 F.2d 126 (7th Cir. 1971), the court held that a consent to search for narcotics did not allow law enforcement officers to seize personal papers and documents as part of the tax evasion investigation: "the officers' use of defendant's limited consent as a ticket to get inside his home and conduct a general search cannot be allowed." *Id.* at 130.

In this case, the officers told Hernandez-Pineda that they needed to get into his home to verify that a missing child was not there. Upon entry, however, they searched places, i.e., drawers, bathroom closets, a duffel bag, where drugs were likely to be found, not places where a missing child would be located. Even if Hernandez-Pineda's consent could be deemed voluntary, the search conducted by the officers exceeded its scope.

## CONCLUSION

For the reasons set forth above, the court concludes that Hernandez-Pineda had a reasonable expectation of privacy in the apartment searched, his consent was involuntary, and the search conducted exceeded the scope of the consent purportedly given. Hernandez-Pineda's motion to suppress must therefore be granted.

**SO ORDERED** at Green Bay, Wisconsin this 25th day of August, 2025.

William C. Griesbach
United States District Judge